NJM:EHS
F. #2024R00116

25 MJ 12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | AFFIDAVIT AND COMPLAINT IN SUPPORT OF AN APPLICATION FOR AN ARREST WARRANT |
| - against - | |
| SERGEI ZHARNOVNIKOV, | (50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(A)-(G) and 4819(b)) |
| Defendant. | FILED UNDER SEAL |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

Nicholas Milan, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

In or about and between April 2022 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SERGEI ZHARNOVNIKOV,[1] together with others, did knowingly and willfully conspire to violate and to cause one or more violations of licenses, orders, regulations, and prohibitions issued under the Export Control Reform Act, Title 50, United States Code, Sections 4801 *et seq.*

It was a part and an object of the conspiracy that the defendant SERGEI ZHARNOVNIKOV, together with others, would and did agree to export and cause to be exported from the United States to Russia firearms on the Commerce Control List, as set forth in

---

[1] The defendant's first name may be spelled "SERGEI" or "SERGEY," and his last name may be spelled "ZHARNOVIKOV" or "JARNOVNIKOV."

Title 15, Code of Federal Regulations, Part 774, Supplement Number 1, without having first obtained a license for such export from the U.S. Department of Commerce.

(Title 50, United States Code, Sections 4819(a)(1), 4819(a)(2)(A)-(G) and 4819(b))

1.    The source of your deponent's information and the grounds for his belief are as follows:[2] I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2018. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for unlawful proliferation of sensitive and military technologies, export control violations, and espionage by foreign governments and related criminal and counterintelligence activity. Through my training, education, and experience, I am familiar with the techniques and methods of operation used by individuals involved in intelligence and criminal activities to conceal their behavior from detection by law enforcement authorities. I have participated in numerous investigations, during the course of which I have conducted physical and electronic surveillance, interviewed witnesses, examined financial records, executed court-authorized search warrants and used other techniques to secure relevant information.

2.    I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendant's criminal history record; and from reports of other law enforcement officers involved in the investigation.

I.    <u>The Export Control Reform Act and Export Administration Regulations</u>

3.    On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which included the Export Control Reform Act ("ECRA"). *See* 50

---

[2]    Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

U.S.C. § 4801 *et seq*.  ECRA provided permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774.

    4.  ECRA provided that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items . . . be controlled."  50 U.S.C. § 4811.  To that end, ECRA granted the President the authority to "control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons."  50 U.S.C. § 4812.  ECRA granted to the Secretary of Commerce the authority to establish the applicable regulatory framework.  50 U.S.C. § 4813.

    5.  Through the EAR, the U.S. Department of Commerce ("DOC")'s Bureau of Industry and Security ("BIS") reviewed and controlled the export of certain items from the United States to foreign destinations.  In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

    6.  The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1.  Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use and end user of the item.

    7.  An exporter generally was required to file Electronic Export Information ("EEI") through the Automated Export System where, among other reasons, an export license was

required, or the value of the commodity being exported was more than $2,500.  15 C.F.R. § 758.1.  The EEI required an exporter to list, among other things, the destination country, the ultimate consignee's name and address, the intermediate consignee's name and address, and a description of the commodity to be exported.  Failure to file EEI or providing false or misleading information in EEI was a violation of ECRA (*see, e.g.*, 50 U.S.C. 4819(a)(2)(F)), the EAR (*see* 15 C.F.R. Part 758), 13 U.S.C. § 305, and the Foreign Trade Regulations (*see* 15 C.F.R. Part 30).

8. Under ECRA, it was a crime to willfully violate, attempt to violate, conspire to violate or cause a violation of any regulation, order, license or authorization issued pursuant to the statute, including the EAR.  *See* 50 U.S.C. § 4819(a)(1).

II. The Defendant and Related Entities

9. The defendant SERGEI ZHARNOVNIKOV is a citizen of Kyrgyzstan.  ZHARNOVNIKOV is the General Director and owner of Kyrgyzstan Company-1, an arms dealer located in Bishkek, Kyrgyzstan.  Russian Company-1, an arms dealer located in Moscow, Russia, has identified Kyrgyzstan Company-1 as its "partner company," in correspondence copying ZHARNOVNIKOV.  Kyrgyzstan Company-2 is an arms dealer located in Bishkek, Kyrgyzstan.  Kyrgyzstan Company-1 and Kyrgyzstan Company-2 appear to be closely related.  In addition to the transactions described herein, Kyrgyzstan Company-1 is owned by ZHARNOVNIKOV, and ZHARNOVNIKOV's spouse ("Spouse-1") is a fifty percent owner of Kyrgyzstan Company-2.

10. U.S. Company-1, headquartered in Chesapeake, Virginia, specializes in the design, manufacturing, and distribution of firearms and firearm-related products.  U.S. Company-1 firearms are renowned for their designs, including the company's flagship offering, a firearm engineered to minimize recoil and muzzle climb, thereby enhancing precision and control, particularly during rapid fire.  U.S. Company-1 sells a diverse range of firearms and accessories

that serve the needs of military units, among others.  Russian Company-1's website indicates that it sells U.S. Company-1 firearms.[3]

III. The Criminal Scheme

11. The defendant SERGEI ZHARNOVNIKOV, together with others, exported from the United States to Russia firearms that required a license from DOC.  As described herein, ZHARNOVNIKOV entered into a contract with U.S. Company-1 to purchase and export U.S. Company-1 firearms to Kyrgyzstan pursuant to a DOC license.  U.S. Company-1 conveyed to DOC, in connection with an application for a license to export firearms to Kyrgyzstan Company-1, that the firearms would not be re-exported from Kyrgyzstan.  The DOC license related to the contract did not authorize the export or re-export of the firearms to Russia.  Despite an absence of a license specific to Russia, ZHARNOVNIKOV exported and re-exported U.S. Company-1 firearms to Russia (via Kyrgyzstan).  These firearms included semi-automatic hybrid rifle-pistols from U.S. Company-1, which required a license for export to Russia (and Kyrgyzstan) from DOC during the time period of the conspiracy.  The semi-automatic hybrid rifle-pistols are controlled for export to Russia (and Kyrgyzstan) under ECCN 0A501.a.

12. On or about February 2, 2020, Kyrgyzstan Company-1 entered into a contract with U.S. Company-1, titled "CONTRACT No. 03-USA," wherein U.S. Company-1 would sell Kyrgyzstan Company-1 "hunting shotguns and rifles, pistols, spare parts and accessories" (hereinafter the "U.S. Company-1 Contract").  The length of the contract was for five years.  The defendant SERGEI ZHARNOVNIKOV signed the U.S. Company-1 Contract on behalf of Kyrgyzstan Company-1.

---

[3] Last visited January 22, 2025.

13. On or about February 3, 2021, U.S. Company-1 received an export license from DOC to export over $800,000 firearms and parts to Kyrgyzstan Company-1. The license stated that items within the scope of the license "may not be reexported or transferred (in-country)," subject to certain exceptions not applicable here. In connection with the license application, U.S. Company-1 submitted a "Letter of Explanation" to DOC stating that Kyrgyzstan Company-1 was the ultimate foreign consignee in Kyrgyzstan, and that Kyrgyzstan Company-1 would sell the proposed firearms shipments to "civilian end users for hunting, target shooting and competition purposes, in accordance with local regulations."

14. On or about May 25, 2021, Kyrgyzstan Company-2 entered into a contract with Russian Company-1 (the Russian-partner company of Kyrgyzstan Company-1) for Kyrgyzstan Company-2 to sell "Goods" to Russian Company-1 in the amount of $10 million USD and noted that the "Goods" could be delivered in batches. The electronic contact information for Kyrgyzstan Company-2, listed an email address with the same last name and first initial as Spouse-1. The contract noted that the "Goods" would be described in an appendix. Based on my familiarity with the investigation, including additional documents summarized below, I understand that the "Goods" described in this contract included the firearms that the defendant SERGEI ZHARNOVNIKOV acquired on behalf of Kyrgyzstan Company-1 pursuant to the U.S. Company-1 Contract. Additionally, based on my training and experience, and familiarity with the investigation, I understand Kyrgyzstan Company-1 to be ZHARNOVNIKOV's company that transacts with U.S. companies, while Kyrgyzstan Company-2, which is fifty percent owned by Spouse-1, is the company that transacts with Russian companies. Based on my training and experience, I further know that criminals who seek to evade U.S. export control laws will often

use separate companies, like Kyrgyzstan Company-1 and Kyrgyzstan Company-2, to obfuscate from U.S. companies and authorities the true end destination of the goods being exported.

15. On or about April 11, 2022, the defendant SERGEI ZHARNOVNIKOV signed an end use certification in connection with a separate license for U.S. Company-1 to export firearms and parts to Kyrgyzstan Company-1, which he provided to U.S. Company-1, that read:

> [Kyrgyzstan Company-1], a company registered for doing business in Kyrgyz Republic, agrees and understands that the products to be imported are authorized by the U.S. Government for export only to Kyrgyz Republic for the use of [Kyrgyzstan Company-1] under the proposed license. They may not be resold, diverted, transferred or otherwise be disposed of to any other country, either in their original form or after being incorporated into other end items, without first obtaining approval from the U.S. Department of Commerce or use of an applicable exemption.
>
> The listed firearms and parts ordered from [U.S. Company-1] will be used for commercial resale and warranties within Kyrgyz Republic for of sporting and hunting.

16. On or about July 2, 2022, the defendant SERGEI ZHARNOVNIKOV emailed an individual associated with a bank who uses a .kg (Kyrgyzstan) email address ("Individual-1") the following, which was in the Russian language: "in the appendix the contract. [A]fter you transfer the money from [Kyrgyzstan Company-2]. Pay the Americans for the goods, I will attach the invoice in the next letter,"[4] and attached the U.S. Company-1 Contract. I understand this email to mean, in sum and substance, that part of the money that ZHARNOVNIKOV, and/or Spouse-1, received from Russian Company-1, by way of Kyrgyzstan Company-2, would be used to pay U.S. Company-1, in exchange for ZHARNOVNIKOV's receiving firearms from U.S. Company-1 and providing them to Kyrgyzstan Company-2 (which

---

[4] Russian-language documents were translated via machine translation.

in turn would provide them to Russian Company-1), in contravention of ZHARNOVNIKOV's assurances that he would not re-export the parts out of Kyrgyzstan.

17. Also on or about July 2, 2022, the defendant SERGEI ZHARNOVNIKOV emailed Individual-1 the following, which was in the Russian language, "Make payment according to the invoice attached to the letter," and attached a commercial invoice from U.S. Company-1 with invoice number 110021 (hereinafter the "U.S. Company-1 Invoice"). The U.S. Company-1 Invoice listed, among other things, 25 "[U.S. Company-1] Rifle / Semi-auto / 16" BRL / 1x10 rd mag / Cal 45ACP / BLK (MD)" with 25 unique serial numbers. This type of firearm is a semi-automatic hybrid rifle-pistol.

18. The U.S. Company-1 Invoice included the following "Destination Control Statement":

> These items are controlled by the U.S. government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or otherwise authorized by U.S. law and regulations.

19. A Kyrgyzstan Company-1 bank statement indicates that two days later, on or about July 4, 2022, Kyrgyzstan Company-2 sent $67,000 USD to Kyrgyzstan Company-1. The next day, on or about July 5, 2022, Kyrgyzstan Company-1 paid $ 65,564 USD—the same amount listed in the U.S. Company-1 Invoice—to U.S. Company-1. The purpose of the payment states: "PAYMENT FOR SPARE PARTS OF SPORT GOODS ACCORDING TO CONTRACT 03-USA DD 02/02/2020, INVOICE NUMBER 110021 [*i.e.*, U.S. Company-1 Invoice] DD 06/16/2022, SALES ORDER NO: SO132752."

20. According to an EEI filing made on or about July 7, 2022, Company-1 exported semi-automatic rifles to Kyrgyzstan Company-1 pursuant to its February 3, 2021 export license on or about July 10, 2022. The port of export was John F. Kennedy International Airport, located in the Eastern District of New York. According to the EEI filing, the value of the export from U.S. Company-1 to Kyrgyzstan Company-1 was over $59,000. The EEI filing's corresponding license application indicated that the firearms were for "commercial resale in Kyrgyzstan." The license stated:

> Items subject to the EAR and within the scope of this license may not be reexported or transferred (in country) unless such reexport or in-country transfer is (i) authorized by this license, or another license or other approval issued by the U.S. Government; (ii) authorized by a license exception or other authorization under the Export Administration Regulations (EAR); or (iii) to a destination, end user, and end use that would be "NLR" (No License Required) under the EAR.

21. A Kyrgyz import document, located in the defendant SERGEI ZHARNOVNIKOV's email account, dated July 29, 2022, details the import of the firearms listed on the U.S. Company-1 Invoice, including the 25 serial numbers matching the U.S. Company-1 Invoice and the matching description as 25 "[U.S. Company-1]: Rifle / Semi-auto / 16" BRL / 1x10 rd mag / Cal 45ACP / BLK (MD)," into Kyrgyzstan.

22. On or about August 8, 2022, Spouse-1 emailed the defendant SERGEI ZHARNOVNIKOV an excel spreadsheet titled in the Russian language, "Supply [U.S. Company-1] ([Russian Company-1]) weapon numbers." Again, Russian Company-1 is a Russian company, and the DOC license did not authorize the export or re-export of the U.S. Company-1 firearms to Russia. The spreadsheet contained two columns, "Name" and "Number." The Name column lists "[U.S. Company-1]: Rifle / Semi-auto / 16" BRL / 1x10 rd mag / Cal 45ACP / BLK (MD),"

*i.e.*, matching the description in the U.S. Company-1 Invoice, and the Number column lists 25 serial numbers, again matching the U.S. Company-1 Invoice.

23.     On or about November 14, 2022, the General Director of Russian Company-1 ("Co-Conspirator-1") executed a "DECLARATION OF IMPORT OF GOODS AND PAYMENT OF INDIRECT TAXES" (the "Import Declaration"), a form used between tax authorities of the member states of the Eurasian Economic Union, which includes both Kyrgyzstan and Russia. The Import Declaration was located in the defendant SERGEI ZHARNOVNIKOV's email account. The Import Declaration listed the seller as Kyrgyzstan Company-2 and the buyer as Russian Company-1 with an address in Moscow, Russia and identified the goods as 25 "[U.S. Company-1] Rifle/Semiauto/16" BRL/1*10rd mag/Cal 45ACP/BLK (MD)," *i.e.*, the same semi-automatic rifle-pistols that U.S. Company-1 exported to Kyrgyzstan Company-1, the defendant SERGEI ZHARNOVNIKOV's company, in Kyrgyzstan.

24.     The defendant SERGEI ZHARNOVNIKOV did not apply for, obtain, or possess a license to export or re-export the semi-automatic pistol-rifles to Russia.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant SERGEI ZHARNOVNIKOV, so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including this Affidavit and any arrest warrants issued, with the exception that the complaint and arrest warrant can be unsealed for the limited purpose of disclosing the existence of, or disseminating, the complaint and/or arrest warrant to relevant United States, foreign or intergovernmental authorities, at the discretion of the United States and in connection with efforts to prosecute the defendant or to secure the defendant's arrest, extradition or expulsion. Based on my training and experience, I have learned that

criminals actively search for criminal affidavits on the Internet and disseminate them to other criminals as they deem appropriate, such as by posting them publicly through online forums. Premature disclosure of the contents of this Affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior and notify confederates.

Nicholas Milan<br>
Special Agent, Federal Bureau of Investigation

Sworn to before me telephonically this 22nd day of January, 2025



THE HONORABLE VERA M. SCANLON  
UNITED STATES MAGISTRATE JUDGE  
EASTERN DISTRICT OF NEW YORK